## Stirling's Estate.

498

Argued March 31, 1941. Before Schaffer, C. J.,
Maxey, Drew, Linn, Stern, Patterson and Parker, JJ.

*Luther C. Braham,* of *Galbreath & Braham,* with him
*Henninger, Ehrman & Shumaker,* for appellant.

*A. S. Fingold,* with him *Reuben Fingold,* for appellee.

*George T. Emery, Jr.,* for appellees.

Opinion by Mr. Justice Linn, June 30, 1941:

The Butler County National Bank and Trust Company of Butler, hereafter called Trust Company, appeals from an order,[1] inter alia, surcharging it for failure, as

---

[1] The order is as follows: "It is ordered and decreed that the Butler County National Bank and Trust Company, executor and trustee of the estate of Thomas Clews Stirling, be and they hereby are surcharged with the difference between the market value of all securities in the estate one year after decedent's

executor, to convert non-legal investments received from the testator. He died December 18, 1929. On December 24, 1929, letters testamentary were granted to his widow Mrs. Stirling, to Mrs. Church, his daughter by a former marriage, and to the Trust Company. The Trust Company filed this, its first account, May 13, 1939, pursuant to an order requiring it, made on the petition of a guardian for minor beneficiaries and the co-executors, Mrs. Stirling and Mrs. Church. They declined to join in the account and excepted on the ground, so far as need now be noted, that the Trust Company had not been reasonably diligent in converting non-legal investments. At the audit the exceptions were sustained and the Trust Company was surcharged.

The learned court held that the will conferred no authority to retain the investments. The Trust Company contends that the will authorized their retention, that it had been so advised by counsel, and that accordingly, it had complied with the rule of common prudence, skill, and caution measuring its obligation to the beneficiaries: see *Dickinson's Estate*, 318 Pa. 561, 563, 179 A. 443; compare *Casani's Estate*, 342 Pa. 468.

---

death, that is on December 18, 1930, and the amount realized at the time when the securities are disposed of; also with the sum of $117.26, taxes paid upon the decedent's real estate as set forth above. The said Butler County National Bank and Trust Company is directed to promptly dispose of all nonlegal securities in the estate at the best prices obtainable and to file a final and distribution account, as executor, paying all unpaid claims properly proven and approved, including the widow's exemption; the balance, including the surcharge imposed, remaining in the said executor's hands after payment of the said claims to be turned over to the said Butler County National Bank and Trust Company to hold for itself and the other co-executors as trustees for the said estate; and to invest and reinvest the same from time to time in such legal securities as their best judgment may dictate under the terms of the decedent's will, as promptly as may reasonably be done, the income therefrom to be distributed from time to time as directed in decedent's will."

Testator was a Presbyterian minister. His will was drawn by former Judge GALBREATH, who died before this dispute arose. In Items 1, 2 and 3, testator provided for his burial, disposed of a clock, and possession of and income from his "homestead" property and contents, giving them to his wife for life, then to his daughter for life, then to be converted by the Trust Company which, "as surviving Executor shall sell said homestead property and safely invest proceeds thereof, preferably in first mortgage or mortgages . . ." Item 4 provided: "It shall be the duty of my Executors hereinafter named to make a complete inventory of investments and securities which I hold at the time of my death. The income from my said securities shall be divided in equal shares between my wife and my said daughter, Mary Jean Church, the same to be paid to each of them quarterly and after my birthday, February 16, of each year, as nearly as can be. After the death of my said wife, the whole of the income on said investments and securities shall go to my said daughter, Mary Jean Church, if living, during her lifetime and shall be paid to her by my Executors, thus giving to her, my said daughter, should she survive my said wife, the use, possession and income of my homestead property above mentioned and all the income from my investments and securities. If, however, my said wife should survive my said daughter then it is my will that the income of my whole estate, after the death of my said wife, shall go to the child or children of my said daughter living at the time of the death of my said wife or a period of twenty-one years after the death of my said wife." In Item 5 testator provided that if his daughter became 60 years of age, the executors should "dispose of $5,000.00 worth of stocks or securities then on hand . . . as to them may seem most advisable to sell at that time, and pay my said daughter the said sum of $5,000.00." In Item 6 he disposed of the income after the death of his wife and daughter by directing that it be paid to the daughter's children for

a period of 21 years, after which, under Item 7, the principal became payable to the daughter's surviving child or children. Item 8 provided: "I do hereby appoint and constitute my wife, Mrs. Etta S. Stirling and my daughter, Mrs. Mary Jean Church, and the Butler County Trust Company of Butler, Pennsylvania, to be the Executors of this my Last Will and Testament, said Trust Company to give bond as required by law. It is my will that my stock certificates and other evidences of my investments shall remain in the custody of said Trust Company, which shall report to each of the other Executors on February 16th of each year the status of the said investments, advising as to the quality of the investments at such time and recommending any changes that may seem advisable, and the said Butler County Trust Company, as Executor aforesaid, is hereby authorized to make such sales and re-investments of my securities as may seem right and proper, after consultation with my other executors, or the survivor of them, and thereafter according to its own judgment. And I do hereby authorize and empower the Butler County Trust Company, surviving Executor, to make sale of my homestead property at the time hereinbefore provided at the highest price to be obtained therefor, and to make, execute, and deliver a deed or deeds therefor to the purchaser or purchasers upon receipt of the purchase money.

"And should an attorney be required in connection with the settlement of my estate, I do hereby appoint Ex-Judge James M. Galbreath of Butler, Pennsylvania, as such attorney and if for any reason he should be unable to act, then John H. Wilson of Butler, Pennsylvania.

"My certificates and securities will be found in my safety deposit box No. X-16, Butler County National Bank, Butler, Pennsylvania."

The testator's investments comprised shares of corporate stock. The learned judge thought that testator

had not intended that his investments should be retained. We cannot concur in that construction of the will; we think testator authorized his executors and trustees and the survivor to retain his investments until such time, as in their judgment or that of the survivor, they should be sold. But even if the learned auditing judge had been correct in his construction of the will, his conclusion would not justify the decree; there is another fact in the case which, even on his interpretation of the will, was not given the effect that we think should be given to it. Testator provided that "should an attorney be required in connection with the settlement of my estate, I do hereby appoint Ex-Judge James M. Galbreath of Butler, Pennsylvania, as such attorney . . ." He was retained by the executors. On that subject, the learned judge said: "So far as the record shows, the only consultation had with Judge Galbreath relative to the estate was at the time of the probate of the will. Mr. Dixon testified that at that time Judge Galbreath then advised that these securities might be retained in the estate. There is no further record of legal advice sought until 1937 when Mr. Henninger met with the Trust Committee for the consideration of the securities in this estate shortly before the starting of these proceedings. There is no record of any advice from Mr. Henninger nor from Galbreath & Braham, successors to Judge Galbreath and Galbreath & Galbreath, until the beginning of these proceedings and the preparation and filing of the first and partial account by the Trust Company. It does not appear that the executors were ever advised by any attorney for the estate that these nonlegal securities could be held indefinitely." The learned judge refers only to the evidence of Mr. Dixon, but, in addition to that, there is the evidence of Elias Ritts, President of the Trust Company, who was asked: "Q. Will you state the advice that Judge Galbreath gave you? A. He said it was his opinion that the will gave us authority and that we should, under the circumstances,

continue the holdings of Dr. Stirling; that they should, of course, be reviewed and considered from time to time, and this action we have taken." There is also the evidence of John G. McMarlin, a Vice-President, who testified: "Q. Was counsel employed in this estate? A. Yes. Q. Do you know who? A. Hon. J. M. Galbreath, ex-judge. Q. Did your committee request an opinion from him as to whether the stocks should be held or sold? A. Yes. Q. And in the management of this estate, did your committee follow the advice which was conveyed to you? A. Yes."

Our cases leave no uncertainty of the effect of the advice of counsel in such circumstances.[2] The subject appears first to have been considered in *During's Appeal,* 13 Pa. 224, 233, in which Chief Justice GIBSON said: "When a trustee has to steer his course among the rocks and shoals of his duty, he would be justly chargeable with the consequences of disaster, did he reject the services of a professional pilot, and act of his own head. He would be guilty, so to speak, of official barratry. On the other hand, he would not be answerable for losses induced by the incompetence of the pilot." Subsequent cases referring to the rule are numerous,[3] the latest being *Henry's Estate,* 341 Pa. 439, 1941. In considering the effect of Judge GALBREATH's advice to the executors, it is first to be noted that testator appointed him, "should an attorney be required in connection with the settlement of my estate." If counsel erroneously contrued his own composition, in advising the executors, the court would not be required to repeat the error by accepting the mistaken interpretation, but the fact that he was "appointed" by the testator for the purpose, was retained by and advised the executors, as he did, are evidence to be considered by the trier of fact

---

[2] See, generally, Scott: Trusts, section 201.

[3] Among them are *Bradley's Appeal,* 89 Pa. 514, 521; *Dempster's Estate,* 308 Pa. 153, 158; *Riebel's Estate,* 321 Pa. 145, 149; *Wanamaker's Trust Estate,* 340 Pa. 419, 422.

who must determine whether the Trust Company applied the required measure of care in the administration of the trust.

The authority to retain the investments did not justify holding without attention. The rule to be applied is that which measures a fiduciary's obligation where the testator authorizes his investments to be retained. It was considered recently in *Crawford's Estate,* 293 Pa. 570, 577, 143 A. 214, and in *Dempster's Estate,* 308 Pa. 153, 159, 162 A. 447, from which we quote: "We further said in that case, [*Detre's Estate,* 273 Pa.] at page 350, that all that is required of a trustee 'is common skill, common prudence and common caution, and he is not liable when he acts in good faith as others do with their own property . . . a trustee will not be held personally liable for an honest exercise of a discretionary power, in the absence of supine negligence or wilful default.' " See also *Dickinson's Estate,* 318 Pa. 561, 563, 179 A. 443. "The trustee is under a duty to the beneficiary in administering the trust to exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property; and if the trustee has greater skill than that of a man of ordinary prudence, he is under a duty to exercise such skill as he has." Restatement, Trusts, section 174.

The next question is: Was the rule of common prudence, skill and caution complied with? The Trust Company was advised by counsel that the investments "should, of course, be reviewed and considered from time to time . . ." and its officers testify this was done. The inquiry was confined, as the learned judge said, to the "stocks of eight corporations" which "according to Mr. Ritts, President of the [Trust Company] and some of the other witnesses, represented a well diversified list of securities, including the stock of well-known corporations, divided among the utilities, rails, oils and industrial stocks." But the learned judge also said: "There is, however, no testimony or record kept showing an

analysis of these particular stocks nor of any particular application of these financial services [which the officers of the Trust Company testified they employed for their information] to these securities." We cannot so read the record. As to all the investments, except the Consolidated Oil Company stock acquired by exchange in March, 1932 (a date subsequent to that fixed as the date of surcharge) the burden of proof was on the exceptants who challenged the administration of the Trust Company: *Clabby's Estate,* 338 Pa. 305, 314, 12 A. (2d) 71. The evidence on this subject came from the Trust Company; in essentials it is without contradiction and we shall refer to part of it. Three officers testified. Mr. Dixon, the Vice-President, who succeeded Mr. McClester who died in 1934 and whose evidence was therefore unavailable, testified: "Q. From your analyses of the stocks at various times, did you deem it wise to make sales at any time, from the time you became trust officer until the present time? A. I did not." His testimony also contains a statement that he discussed these investments periodically with the President, Mr. Ritts, when "we would take the stock ledgers and go over them and Mr. Ritts would make his comments and it always wound up by keeping the stocks." Mr. Ritts, President of the Trust Company, testified that he made a review of the investments as early as within 30 to 60 days after Dr. Stirling's death. He referred to each of the stocks in detail. He was asked: "Q. During the period this estate was in your hands did you receive annual reports from the companies? A. Yes. Q. Did you analyze those reports? A. Yes. We have securities in practically all those companies ourselves and we always check over the annual reports when they come in." This would indicate, and it is an element of importance, that the Trust Company acted with respect to this trust property as it acted with respect to its own investments. He also testified: "Q. Wasn't it one of the primary reasons on the part of the bank in holding these stocks, the hope that

things would get better? A. We felt it was a carefully selected diversified list. They had been held by Dr. Stirling at higher prices and the outlook and the reasonable conclusion was that things would be better and why should we sell them. Q. Really wasn't it the hope on the part of the bank that times would get better? A. That was the hope and we felt it would be the case. Q. And it was the hope, by maintaining these stocks, that you would get a better price for them? A. We were not figuring on selling them. We didn't figure under the terms of the will we should sell them." Mr. McMarlin, the Vice-President, testified to similar analyses; he was also asked: "Q. What digests does the bank have for analyzing stocks in estates? A. Well, they have used different ones—Moody, Fitch, Poor, Standard Statistics, Wall Street Journal and Barrons. Q. Did you personally consult these digests? A. Yes. Q. Did you in 1930 and from that time up to the present time consult them? A. Yes." Asked whether he applied the results of those "digests" to investments in this estate he replied that he did and mentioned some of them. Asked "Q. How often would your committee examine the securities and analyze them in this estate? A. I would say twice a year, probably three times a year. Q. What was the purpose of this analysis? A. To go over estates, particularly estates of this type to know the situation at that particular time. Q. What were your conclusions, after you had analyzed this estate, whether sales should be made or not? A. We concluded each time there should be no change. Q. There had been considerable shrinkage in a list of this kind? A. Yes. Q. It was not only characteristic in this list but to every list? A. Yes, to all classes." No written minutes were produced because the testimony is that prior to 1937 no minutes were kept by the committee that examined the investments from time to time; but the absence of written minutes, however desirable they might be, is not fatal; the other evidence is relevant. The conduct of the Trust

Company must be judged as of the time or times in which it reached its conclusions and not in the light of later events: *Detre's Estate,* 273 Pa. 341, 349.

It is also quite clear from what the learned judge says, in dealing with another aspect of the case, that if he had concluded, as we have, that there was authority to retain testator's investments, he would have found there was no breach of duty. This appears, we think, in what the learned judge said in disposing of an exception challenging the Trust Company's right to commissions: "Relative to executors' commissions: The executors, although somewhat dilatory, were guilty of no fraud or misrepresentation. We have no doubt that the executors in the handling of the estate did what, in their judgment was for the best interests of the estate and now that a large loss has occurred through an error of judgment we do not feel that they ought to be deprived of all compensation." If the appellant did what, in its judgment, considering the circumstances, was for the best interests of the estate, loss resulting from mere error in the honest exercise of judgment would not be ground for surcharge as cases already cited in this opinion show.

One investment requires separate consideration. Testator had invested in 300 shares of Prairie Pipe Line common stock. This company was consolidated in March, 1932, with others and, in place of Prairie Pipe Line stock, the estate has since had 420 shares of Consolidated Oil Company stock. As we understand exhibit No. 11, the value in 1932, the year of the exchange, was $5,145 high, and $2,310 low; between the time it was received and the last date shown in the exhibit, May 6, 1940, the price fluctuated, sometimes being above and at others below the value in 1932. Mr. Mc-Marlin testified that, after the exchange, the Consolidated Oil stock paid a dividend and was paying a dividend at the present time. The investment received in exchange for the Pipe Line stock is not the one made by the testator but one made by the accountant and is

therefore subject to a different rule from that applied to the other seven investments unless the Trust Company shows that it was substantially equivalent to that exchanged.[4] This, the Trust Company has not shown. But it is also a fact that the effect of the acquisition and retention of this stock was not dealt with in his adjudication by the learned judge, presumably, because the exchange had not been made by the Trust Company at the date fixed by the court, one year after testator's death, as the time for ascertaining the amount of the surcharge. Whether the Trust Company performed its duty with respect to this investment, is, in the first instance, a fact to be determined by the learned court below. If the finding be against the Trust Company, the investment should be taken over by the Trust Company, stricken from the account, and cash substituted therefor in the amount of the value of the investment on the date when the Trust Company, in the exercise of reasonable diligence, should have sold it with interest at 4% less dividends received. The base on which the charge is to be calculated, if, after hearing, a surcharge is imposed, a point on which we express no opinion, is the market value of the investment received in exchange in 1932, and not the inventoried value of the Prairie Pipe Line investment received from the testator as to which no breach of duty was shown.

We need say nothing at this time on other points made in the brief by the appellees, which were not considered in the adjudication filed below. As we cannot sustain the surcharge imposed, the decree must be reversed, but the record must be returned (compare *Taylor's Estate,* 277 Pa. 518, 529, 121 A. 310) to enable the court to deal with the Consolidated Oil Company investment either on the record as formerly presented, or, by leave of the

---

[4] *Scott's Trust,* 322 Pa. 1, 184 A. 245; Scott: Trusts, sec. 231.4. Compare *Dauler's Estate,* 247 Pa. 356, 93 A. 511; *Buist's Estate,* 297 Pa. 537, 147 A. 606.

court, on additional evidence to be received. The order appealed from also surcharges the Trust Company with the sum of $117.26, taxes paid on the decedent's real estate without prejudice to its right to recover such amount from the life tenant or to take it from any moneys that may come into its hands payable to the life tenant. This surcharge of the item of $117.26 is affirmed.

The decree surcharging for retention of investments is reversed; the record is remitted with instructions to consider the Consolidated Oil Company investment in the light of this opinion; costs of the proceeding shall be paid 80% out of principal, 10% out of income, 10% by the Trust Company.

Mr. Justice DREW and Mr. Justice STERN concur in the result.