Glauser Estate.

Argued April 17, 1944. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and HUGHES, JJ.

*J. H. Ward Hinkson,* for life tenant, daughter of decedent, appellant No. 78, and for decedent's widow, trustee, and individually, appellant, Nos. 79 and 80, appellee No. 88.

*James L. Rankin,* of *Geary & Rankin,* with him *J. Allen Hodge* and *Guy D. DeFuria,* for Delaware County Trust Co., trustee, appellant No. 88, appellee Nos. 78 and 107.

*Edward H. P. Fronefield,* with him *Edward H. Bryant, Jr.,* and *Lutz, Reeser & Fronefield,* for guardian ad litem of minor remaindermen, appellant No. 107.

OPINION BY MR. JUSTICE LINN, June 30, 1944:

There are five appeals from orders in surcharge proceedings on exceptions to the first account of trustees under the will of Edwin D. Glauser, who died January 12, 1925. His widow and the Delaware County Trust Company were appointed executors and trustees. On January 5, 1926, their first and final executors' account was confirmed and the balance was awarded to them for administration as trustees.

At the date of his will, March 15, 1921, testator was engaged in Chester in the lumber and mill work business. He made certain provisions concerning the business but in December, 1922, he transferred it to Stacy G. Glauser & Son, Inc., hereafter referred to as Glauser company, for 4,000 shares of its stock. He gave 1,500 shares to his wife, sold some 700 shares to employees and retained the balance. His trustee held 1,761 shares, a minority interest. He made no change in his will after transferring the business to the corporation.

He directed that the net income from the residue be paid in equal shares to his widow and to his daughter during their joint lives, and to his daughter after the death of his widow, with remainder, on the daughter's death, to her children, etc. In the 9th and 11th paragraphs of his will he provided: "Ninth: As a part of my estate is invested in the lumber and mill work business, in order that the interest of my heirs shall not suffer by a forced sale of such business, I hereby authorize and empower my Executors hereinafter named and the survivor of them at their discretion to carry on said business with as full power as I could do if then living until such time as a favorable sale of the business can be made, but only for a limited time not exceeding three years to permit of a sale on a favorable market; and I authorize and empower my said Executors and the survivor of them to sell said business together with any and all real estate used in connection therewith, the real estate being sold by virtue of the power hereinafter given, or to sell the personal property and the real estate separately in parts or parcels or otherwise, as my said Executors or Executor may deem most advantageous to my estate. My Executors shall not be responsible except for good faith in the management of my business and the sale thereof."

"Eleventh: I hereby authorize and empower my said Executors or Executor and Trustees or Trustee to hold and retain as parts of my estate and the trusts here-

under any securities or investments owned by me at the time of my decease, to subscribe to stock allotments, to pay dues on Building Association stocks until the maturity thereof, and to sell at public or private sale, alter, vary and change such securities and investments from time to time at their or its discretion, and to make reinvestment of the proceeds of any sale or sales thereof, not being confined to what are known as legal investments."

Assignments of error complain of the refusal to surcharge in four respects: (1) for loss by retention of stock of Glauser company; (2) for loss by investment in and retention of stock of Delaware County Trust Company; (3) insufficient surcharge on account of purchase of stock in 1931 from employes of the Glauser company; (4) on account of payment alleged to have been unlawfully made in 1933 on testator's endorsement.

(1) Testator's daughter, Mrs. Spackman, and Mr. Fronefield, guardian ad litem for her children and unascertained remaindermen, in their appeals, complain that the trustees were not surcharged with loss of the investment in the Glauser company stock. After testator's death, his widow, who had been a director, was elected president of the company; Joseph K. MacLean, who had been vice president and secretary, and who is described as testator's trusted assistant, became treasurer.[1] Willis K. Glauser, testator's cousin, became secretary. He was a member of the bar of Delaware County and was assistant trust officer of the Delaware County Trust Company, a position said to have been obtained on the recommendation of testator, a director of the trust company. During 1925 and 1926 the Glauser company prospered and earned and paid dividends of 8% in each

---

[1] Mrs. Glauser was asked, "Q. Isn't it a fact that all of the men who were engaged in key positions in the Glauser Company before your husband's death were retained after his death? A. Until we were advised to close down the mill."

year. In 1927 a dividend of 6% was paid, partly out of surplus. Thereafter the business was unsuccessful. In 1931 a creditors' committee took over the assets and liquidated them.

By transferring his business to the corporation and disposing of a majority of the stock, testator created conditions to which the ninth paragraph of his will were no longer wholly applicable. The accountants retained the stock pursuant to express authority. Testator had also provided that his "executors shall not be responsible except for good faith in the management of my business and the sale thereof."

In *Stirling's Estate,* 342 Pa. 497, at p. 504, 21 A. 2d 72, we said: "The authority to retain the investments did not justify holding without attention. The rule to be applied is that which measures a fiduciary's obligation where the testator authorizes his investments to be retained. It was considered recently in *Crawford's Estate,* 293 Pa. 570, 577, 143 A. 214, and in *Dempster's Estate,* 308 Pa. 153, 159, 162 A. 447, from which we quote: 'We further said in that case [Detre's Estate, 273 Pa.], at page 350, that all that is required of a trustee "is common skill, common prudence and common caution, and he is not liable when he acts in good faith as others do with their own property . . . a trustee will not be held personally liable for an honest exercise of a discretionary power, in the absence of supine negligence or wilful default." ' See also *Dickinson's Estate,* 318 Pa. 561, 563, 179 A. 443. 'The trustee is under a duty to the beneficiary in administering the trust to exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property; and if the trustee has greater skill than that of a man of ordinary prudence, he is under a duty to exercise such skill as he has.' Restatement, Trusts, section 174."

As testator authorized retention of the investment, the burden of proving negligence in retaining it was on the exceptants: *Jones Estate,* 344 Pa. 100, and cases

cited p. 104, 23 A. 2d 434. The learned auditing judge held there was no proof to sustain a finding of negligence. The appellants challenge that finding.

It is first to be observed that there is no evidence of any market in which accountants could have sold the minority interest in the Glauser company: compare *Miller's Estate,* 345 Pa. 91, 26 A. 2d 320; *Quinn's Estate,* 342 Pa. 509, 21 A. 2d 78. They do not, however, rest merely on the absence of market for the shares of stock. They called witnesses to give their opinions as to possible sale of the property of the company. Mr. Mitchell, engaged in "retail lumber, mill work and building supplies," in Delaware County, said that he made an effort in 1927 and 1928 to dispose of his business and could find no market except "at a tremendous sacrifice," by which, he said, he meant "At less than 50% of our valuation." He said he was familiar with the business of the Glauser company which was a "more specialized business and would be harder to dispose of." He stated that "It is our experience that sales started to drop about 1927 and '28 and that was general all over the country." Mr. Wood, engaged in the "lumber business [and] mill work" in Delaware County, said he was familiar with the Glauser business and thought it ". . . might have been sold at a sacrifice, I don't think it could have been sold for one hundred cents on the dollar." He stated that he had been in the Glauser lumber yard a number of times and that while he knew nothing "about their book affairs, . . . the stock in their lumber yard, like any yard established for a long time, had a lot of unsaleable material which they never could have gotten even the cost for." A third witness, Mr. Finley, was a wholesale lumber dealer who sold lumber to the Glauser company. He stated that he did not recall any sales "of the business of the type of Glauser business . . . between 1920 and 1930," though he "tried to" keep track of the sales. He said that his lumber business began to decline in 1928. Asked, "What happened

in 1929," he answered, "Of course the collapse came, but the lumber business was very much off all of '29, even before the collapse." He became a member of the creditors' committee that operated the Glauser company from 1931 until it was sold some eight or nine years later. He testified that he thought the business could have been sold at the beginning of 1928, but, when asked "At what kind of figure?" he replied, "Well, I don't know that. I believe it could have been sold, but not as good a price as it would have gotten if sold two or three years earlier. All business people began to recognize a slight decline in business in 1928, in the lumber business." He was asked about the character of the management after Mr. Glauser's death: "Q. And in the three or four years after his death did you regard it as a well managed business? A. I regarded it as well enough managed to keep on selling to them. Q. And you gave them liberal credit? A. I gave them liberal credit up until 1929-30 in there, I was a very small creditor at the time the creditors' committee was appointed. Q. And others gave them liberal credit in '26-'28? A. Yes, right on up to the time of the creditors' committee there was a fair amount of accounts payable, . . ." He said that in 1929 he concluded that "The management [was] incapable." S. L. Irving, a director of the Chester National Bank, was a member of the creditors' committee, and testified that from 1925 to 1930 his bank loaned money to the Glauser company on single name paper and that the credit reputation of the company all those years was "very good." He said his bank ". . . considered it good up until December of 1930." From 1926 to 1930, reports of the company's condition, similar to those made to testator, were made by Eastern Millwork Company and were considered by testator's widow and Willis K. Glauser on behalf of the trust company.

We cannot agree with the contention made on behalf of Mrs. Spackman that the trustees paid no attention to the Glauser company investment. There is evidence

that they considered the retention of the Glauser stock from time to time. Both sides are at some disadvantage because Mr. MacLean, the treasurer of the Glauser company, and Willis K. Glauser, secretary of the company and also assistant trust officer of the Delaware County Trust Company died sometime before the account was filed. There is no suggestion that Mrs. Glauser and the trust company did not act in good faith: compare *Miller's Estate,* 345 Pa. 91, 93, 26 A. 2d 320. Mrs. Glauser testified that she went to the trust company and saw Willis K. Glauser "possibly once a month" though "usually on [her] own business"; she received letters and reports from the trust company, and "after [she] commenced to feel that the principal was dwindling" she and her daughter, Mrs. Spackman would "go in and talk to Willis Glauser." She was asked: "Q. Mrs. Glauser, you knew, of course, that the estate continued to hold these seventeen hundred and odd shares of stock in the Stacy G. Glauser and Son Company? A. Yes. Q. Did you ever suggest to anybody at the Delaware County Trust Company that the estate should sell the shares owned by the estate in the Glauser company? . . . A. No, I don't think I did. Q. After you were made president of the Stacy G. Glauser & Son, you knew something, at least, of its affairs, didn't you? You were at all of the meetings of directors, weren't you? A. Yes. Q. You were at all of the meetings of the shareholders? A. No. Q. Didn't you preside at meetings of the shareholders held in the Company office? A. No, I presided at meetings in my own home with the officers. Q. Take your annual meetings where stockholders were present, to elect directors and transact business, didn't you preside at those meetings? A. I don't remember. Q. Are you sure you didn't? A. I am pretty sure I didn't, but I don't know." She was asked: "Did you at different times discuss the matter of this estate with your son-in-law? A. I would not know. Q. Did you ever discuss with him the matter of any of the details of investments

in your husband's estate with Mr. Spackman? No.
Q. Did you ever go over any of these semi-annual reports
with Mr. Spackman? A. Well, they had a copy of it.
Mr. and Mrs. Spackman had a copy. Q. Do you mean
they had a copy of the semi-annual reports sent out?
A. Just the same as I had, not the full report, just the
analysis, that you showed me." Her son-in-law, Mr.
Spackman, also testified on the subject at some length,
saying, inter alia, "Q. Did he tell you any effort was
being made to get rid of it? A. It seems they were wait-
ing for someone to come along and buy it. . . . Q. When
did you ask him that, on how many occasions over the
years? A. I would say this, it will have to be a guess,
I would guess that I probably asked him that at least
every three months, not all of those times in the bank
of course, but at times when I would play bridge with
him I would always say 'how are you coming along with
the sale of the Lumber Company'? Q. What was his
reply? A. The same one that I gave you before that you
can't just go out and sell something like that, you have
to wait until someone comes along. Q. Was the matter
of liquidation discussed in your hearing? A. That was
finally discussed."

Mrs. Spackman testified: "Q. Between 1928 and '31,
can you give us any idea of how many times you spoke
to Mr. Glauser about the continued retention of the
Glauser company stock? A. I can't give you an accurate
figure, I spoke to him about it quite a few times because
it disturbed me. Q. Did you discuss it with your mother?
A. Not very much. Q. Did you discuss it with your
husband? A. Yes." In cross-examination she said,
"Q. You can't point to any incident to which you raised
any question until after the dividends stopped, is that
true? A. I cannot as of a time. Q. You say that Mr.
Willis Glauser pointed out to you that while there was
a certain book value of the stock, that a large part of
that was good will? A. Yes. Q. Didn't he say to you
there was no market for that stock? A. He said there

was probably no market for the business at that point, he didn't say he tried to find one. I said 'why shouldn't it be liquidated,' there was certainly a lot to be gotten for it. Q. Were you talking to him about liquidation or selling the business, is that what the subject of your discussion was? A. Isn't that what we are talking about? Q. I am asking you? A. Yes. Q. So that your discussion with Willis Glauser of its business, or its mill, of its assets, that is true? A. Yes. Q. Your idea was that the Company might liquidate in that way, sell its lumber and millwork, cash in its cash receipts? A. Yes. Q. You never discussed with him the question of the sale of your father's estate's holdings of stock in the Company did you? A. I have not the slightest idea, I was discussing the matter of getting it out of the estate, I am not sure in what form I discussed getting it out."

There is no proof to support a finding of negligence in retaining the stock. We must therefore overrule the assignments of error complaining of the refusal to surcharge on this item.

(2) The testator, one of the directors of the Delaware County Trust Company, owned 47 shares of stock of the company. The par value was $100 and, in 1926, it brought $200 at public sale. His will authorized subscription to allotments. The trustees took an allotment of 47 shares at par in 1926. There is evidence that every stockholder took up his allotment. As late as in 1929 there were public sales at over $300. In 1931 the trust company got into difficulty, though it continued to pay 8% dividends until January, 1932, and at a less rate the next year. Between 1925 and 1930, only one-half of one percent of the stock changed hands. Mrs. Spackman and the guardian ad litem complain of refusal to surcharge accountants with the loss on the investment. We of course recognize the force of the objection against a fiduciary's holding and acquiring its own stock as a trust investment, but we must also recognize that the

testator authorized his fiduciaries to do it. With respect to this item, also, the burden of proof was on the exceptants. "The propriety of an investment must be judged as it appeared at the time it was made and not as viewed in the light of subsequent events." *Heyl's Estate*, 331 Pa. 202, 208, 200 A. 834. There is no evidence to support a finding that the retention of this stock was not given attention. We must agree with the learned court below that the record does not show that accountants failed in their duty with respect to this stock. Compare *Greenawalt's Estate*, 343 Pa. 413, 21 A. 2d 890.

(3) The testator in 1923 made separate agreements with several employes of the Glauser company by which he sold to each, certain shares of the company's stock. The purchaser agreed "That in the event of death, resignation or leaving the employ of" the Glauser company, "his Executors and Administrators, hereby covenants and agrees to sell, assign, transfer and set over to the said Edwin D. Glauser, his Executors, Administrators and assigns, the said . . . shares of stock in said corporation, at par." The agreement also provided that Glauser would purchase "the said . . . shares of stock . . . at par, upon his death, resignation or leaving the employ of" the company. The accountants claim credit for $13,250 expended in 1931 in purchasing 265 shares of the stock at $50.00 per share. Of the 265 shares, 200 were the subject of re-purchase agreements; 65 were not. In an exhibit, filed by one of the exceptants, it appeared that the cash value of the capital stock as reported to the Commonwealth for 1930 was $23.71 per share. Based on that exhibit, the learned court surcharged accountants with the difference between $50.00 per share, the amount paid by them, and the sum of $23.71, making a total of $6,966.85.

On this item we must differ from the learned auditing judge. There was no obligation on accountants in 1931 to purchase the stock. While the contracts provided that on the "death, resignation or leaving the employ"

the stockholder or his representatives would sell to Mr. Glauser and provided that he would purchase, the parties omitted from the contract any provision that the stock should be purchased after his death by his personal representatives. At most, there might have been implied a term to the effect that time for performance would end with the final accounting of his executors, for, as was said in *Bland's Admr. v. Umstead,* 23 Pa. 316, ". . . the law does not profess to keep up the representation of a dead man's estate longer than is necessary to settle it." No notice was given and claim was made, doubtless because none existed, at the audit of the executors' account, confirmed January 5, 1926. Compare *Doster Estate,* 346 Pa. 455, 31 A. 2d 142; *Mack Estate,* 111 Pa. Superior Ct. 20, 169 A. 468. These accountants were not obligated by the contract to purchase the stock in 1931 and may not take credit for the unauthorized expenditure.

Mrs. Glauser, with respect to this item in her appeal as trustee, complains that the surcharge was imposed on both accountants, contending that the transactions were conducted by the trust company without her knowledge and consent and for that reason the trust company alone should be surcharged. In referring to the transaction, the learned judge said, "This was apparently done by the corporate trustee alone." Later, however, he said, "It is alleged that the transaction itself was conducted by the corporate Trustee, but the Individual Trustee says that she was consulted about the matter and was told that it had to be done and raised no objection to the consummation of the business." If the evidence supported the finding, the conclusion might follow. The brief of the trust company makes no reference to any evidence that would support the finding of the learned judge. The statement is challenged on behalf of appellant. We have read the evidence [2] and find nothing

----

[2] All that we find on the subject in the printed record appears in the following quotation from Mrs. Glauser's testimony: "Q. Mr. Rankin has inquired with respect to Mr. Gott, Mr. Innis, Mr. Staus,

that sustains the finding. As the purchases were made by the trust company without the knowledge and consent of the other trustee, her assignment of error must be sustained and the trust company ordered to replace the unauthorized payment.

(4) The guardian ad litem excepted to the payment of $4,807.99 to the First National Bank of Chester. Testator, with several others, in November, 1925, had endorsed a note for $22,000 which became the property of the bank. June 25, 1926, Mrs. Glauser, individually and as executrix and trustee of her husband's estate, and the other endorsers, or their representatives, agreed to pay the debt. The accountants claim credit for $4,807.99 paid to the bank on January 30, 1933, in discharge of the obligation. The learned judge held the payment unauthorized but, instead of requiring its repayment to the trust, he refused to surcharge the trust company and charged Mrs. Glauser as having received an advancement by the trustees pursuant to authority contained in the 8th paragraph of the will. The will provided: "Eighth: I hereby authorize and empower my Trustees or Trustee to pay and advance to my said wife, Emma P. B. Glauser, and my said daughter, Kathryn Dunlap Glauser, respectively at any time or times during their respective lives, in parts or in one payment, such amount or amounts from their respective shares of the principal of this trust, as in the sole judgment of said Trustees or trustee, may be reasonably required for their proper support, comfort or welfare, but the total payments from principal to be made either to my said wife or my said daughter shall not exceed the one-tenth part of their respective shares. My said Trustees or Trustee shall have full discretion to value my estate

---

and it already appears in this record that they were stockholders, it also appears by the account of the trustees here, that their stock was subsequently purchased in 1931 by the co-trustee, were you ever consulted by the Delaware County Trust Company with respect to the proposal to acquire the stock of Gott, Innis and Staus? A. No, simply told it had to be done. Q. Were you ever asked as to the desirability of doing it, or your consent solicited? A. No."

in order to determine the amount of these payments. The income payable to my said wife and daughter respectively shall be reduced in proportion to the payments made from their respective shares of the principal. My said Trustees or Trustee shall not be responsible for the use of these advances from principal. The receipts therefor of my said wife and daughter shall be a full release and discharge to the said Trustees or Trustee."

Speaking of the payment of testator's obligation, the learned judge said: "It is sure it would not be an arbitrary thing to say that it was made for her particular comfort, support and welfare. This, however, should be allocated to and against 'her share of the principal, or that portion of the principal which she acquired the income which this Will requires to be paid to her'."

We think the testator, by using the words "proper support, comfort or welfare," intended exactly what the words import; that he intended to authorize the trustees "to pay and advance" part of principal on two conditions: (1) demand by the beneficiary for a purpose specified, and (2) subject to the discretion of the trustees to approve or disapprove. We can see no basis for the conclusion that the payment made by the accountants is within the intention expressed in the will. Mrs. Glauser did not request an advancement pursuant to paragraph 8, and, in joining in the payment, did not act pursuant to paragraph 8. The assignment of error must be sustained and both accountants surcharged with the amount wrongfully paid.

At the argument on the exceptions in the court below the question of the rate of interest, payable on the surcharges, was raised; counsel for exceptants suggested 4% and counsel for the trustees 3%. The court thereupon fixed 3½% to which no objection is made. Both accountants shall, in equal parts, restore to the trust the sum of $4,807.99 with interest at the rate of 3½% per annum from January 30, 1933, and, in addition, the Delaware County Trust Company shall restore the sum

of $13,250 with interest at the rate of 3½% per annum from the respective dates of the purchase of Glauser company stock in 1931.

Affirmed in part, reversed and modified in part; costs to be paid by accountants in the proportions in which they are surcharged; record remitted for the entry of appropriate orders.