**Zimbalist Estate**

*Cuthbert H. Latta,* for accountant.

*Richard P. Brown, Jr.,* and *W. Wesley Nagle, H. Ober Hess, John J. Lombard, Jr.,* of *Obermayer, Rebmann, Maxwell & Hippel,* and *Robert P. Oberly,* for various beneficiaries.

*William White,* guardian and trustee ad litem, p.p.

*James L. Price,* for Commonwealth as parens patriae.

KLEIN, A. J., May 11, 1973.—By deed of trust dated May 14, 1951, entitled the Penobscot Trust, Mary Curtis Zimbalist transferred 20,000 shares of the prior preferred capital stock of the Curtis Publishing Company to her trustees to pay the net income in equal shares to her sons, William Curtis Bok and Cary William Bok, for life, and thereafter, per stirpes, to their lawful descendants until the termination of the trust, which is to occur upon the death of the survivor of the two sons and seven named grandchildren, with further provisions which need not be recited for the purposes of this adjudication.

The original trustees were William Curtis Bok, Cary William Bok and Robert Gibbon. Pursuant to the provisions of the trust instrument, when William Curtis Bok died on May 22, 1962, Derek C. Bok was appointed as substituted trustee; when Robert Gibbon resigned on August 2, 1962, Jay H. Mattis was appointed in his stead; and when Derek C. Bok resigned on September 24, 1968, Ferdinand P. Schoettle was appointed to fill the vacancy. The reason for filing the present account is the death of Cary W. Bok on December 9, 1970. The vacancies created by his death and by the subsequent resignation of Jay H. Mattis on March 30, 1971, were not filled, leaving Ferdinand P. Schoettle as the sole trustee.

The only asset in the trust at the present time is the original bloc of 20,000 shares of Curtis Publishing Company stock. The account is stated from May 14,

1951, to June 30, 1971, and shows a balance of principal of $795,000 representing the value of the shares at the time they were received from the settlor. The value given in the account for the same shares as of June 28, 1971, is $40,000. It should be noted, however, that at the audit on December 16, 1971, Mr. Brown informed the court that for gift tax purposes the stock was valued by the Internal Revenue Service at $980,000 as of the date of the establishment of the trust, and that the actual value as of June 28, 1971, was $100,000. The figure of $40,000 was used in the account because it was estimated to cost $60,000 to prepare a filing and registration statement for the Securities & Exchange Commission if the stock were to be sold.

A supplemental accounting of income was filed showing a balance of $839,917, of which all but one dollar has been distributed to the income beneficiaries.

All parties in interest are stated to have received notice of this audit. Proof of compliance with Rule 5, section 5, of the Supreme Court Orphans' Court Rules relating to notice to the Attorney General of the Commonwealth of Pennsylvania in cases involving charitable gifts, is annexed.

By decree of this court dated July 28, 1971, William White, Esq., was appointed guardian ad litem for minors and trustee ad litem for all unborn and unascertained interests. Mr. White filed a written report in which he said, in pertinent part:

"The Trust instrument authorizes the retention of the assets received from the settlor in the following language: 'The said Trust estate may be retained in the form in which it now is, or from time to time the whole or any part of the securities or other investments in which said Trust estate may for the time being be invested, may, in the absolute discretion of the then Trustees, be sold at such time or times, at

public or private sale, and upon such terms, as the then Trustees may deem meet . . .'

"The obvious question before the Court is whether the powers of retention given the Trustees exonerates them from any liability for the paper loss of more than 90% of the original value of the corpus of this Trust.

"In Dickinson's Estate, 318 Pa. 561, 179 A. 443 (1935), the Supreme Court had the following to say on the subject:

'The law is clear that where (as here) a trustee is authorized to retain the settlor's non-legal investments, and in so doing exercises reasonable skill, prudence and caution in the management of the estate and is guilty of no bad faith, no surcharge will be imposed. The power to retain non-legal investments having been granted, such securities may be retained by fiduciaries "unless facts known to them, or which by ordinary watchfulness could have been known to them, rendered the holding of such securities an act of which it is inconceivable that one desiring to do his duty would, in the exercise of "ordinary good business judgment or foresight," have been guilty': Linnard's Estate, 299 Pa. 32, 37.

"The rule is stated in a different and somewhat stronger form, in Stirling's Estate, 342 Pa. 497, 21 A.2d 72 (1941), at p. 504, to wit:

'The authority to retain the investments did not justify holding without attention. The rule to be applied is that which measures a fiduciary's obligation where the testator authorizes his investments to be retained. It was considered recently in Crawford's Estate, 293 Pa. 570, 577, 143 A.214, and in Dempster's Estate, 308 Pa. 153, 159, 162 A. 447, from which we quote: "We further said in that case, Detre's Estate, 273 Pa. at page 350, that all that is required of a trustee 'is common skill, common prudence and common caution, and he is not liable when he acts in

good faith as others do with their own property . . . a trustee will not be held personally liable for an honest exercise of a discretionary power, in the absence of supine negligence or wilful default.' " '

"It is obvious from the foregoing statements of our Supreme Court that trustees, even where given the power to retain assets received from a settlor, have a greater duty than merely to retain such assets throughout the duration of the trust.

"Here the trustees were not only authorized to retain investments, but they were expressly authorized to dispose of the original securities and to make other investments in their place.

"Under these circumstances, the present account clearly raises questions as to whether the trustees have met the standards which are required of them. These questions can only be met by adequate testimony to show whether the trustees, in fact, have carried out their duties as they have been defined by our Supreme Court."

Extensive testimony was thereafter taken at a hearing on December 16, 1971. At that time, Mr. Brown submitted a stipulation entered into by him as cocounsel for the accountants and by Mr. White as guardian and trustee ad litem, which presented in detail the history of this trust and the other family trusts and foundation holdings of Curtis Publishing Company stock. It is of interest to note that the original family holdings of approximately 1,200,000 shares of Common and Preferred Stock of Curtis Publishing Company was distributed among 10 different trusts and foundations, one being the Penobscot Trust, which held 20,000 shares of preferred.

Testimony was heard from Allison Page, of the firm of Pepper, Hamilton & Scheetz, who was one of the counsel to the Curtis Publishing Company during the period 1960 to 1970, as to the various offers and in-

quiries that were made for the purchase of some or all of the family stock. William C. Bodine, of the same firm, was one of the counsel to the Curtis trustees and he testified as to what they knew and what they did during this period with regard to the family holdings, including the Penobscot holdings. Ferdinand P. Schoettle, the sole surviving trustee, became a trustee of the Penobscot Trust and other trusts in 1968, and he testified as to his knowledge of the situation.

In brief, the testimony demonstrates beyond question that the trustees were at all times fully aware of the progressive deterioration in the financial condition of Curtis Publishing Company. It is also clear that Federal statutes and regulations made it virtually impossible to dispose of the trust holdings during the period in question. To add to the dilemma of the trustees it appears that Mrs. Zimbalist, the settlor, for a long time would not give her consent to the sale of any of the Curtis stock, even if such sale could have been arranged.

One further point is worthy of comment. In addition to the retention clause in the trust instrument which Mr. White quoted in his report, supra, the deed of trust contains an exculpatory clause which reads as follows:

"No Trustee hereunder who is an individual shall be required to give any bond or other security in any State or place for the faithful performance of his duties hereunder, nor shall any Trustee hereunder who is an individual be liable for any error of judgment, nor for any act of any other or of any agent, nor for anything except his own wilful default or malfeasance."

Having heard the testimony and having carefully studied the entire record in this case, the auditing judge finds as a fact that there was no willful default or malfeasance on the part of any of the trustees who administered this trust. The law in Pennsylvania at the time the trust was created was that trustees acting

with good faith and without willful default or fraud will not be responsible for any loss that may arise. All that the courts require from trustees is common skill, common prudence and common caution. They will not be held personally liable for an honest exercise of a discretionary power in the absence of supine negligence or willful default.

Moreover, a trustee is not required to be infallible in his judgment nor to possess the power to anticipate events not generally expected. If common prudence and common skill are exercised, a loss which is incurred must be borne by the trust estate which the settlor, who is assumed to have contemplated such risks, has seen fit to confide to the care of his trustees.

In 1961, the Legislature of the Commonwealth of Pennsylvania adopted the "Prudent Man Rule." It provided that any investment may be retained in the exercise of that degree of judgment and care, under the circumstances then prevailing, which men of prudence, discretion and intelligence exercise in the management of their own affairs.

It is clear that this was a most extraordinary situation. The dynasty created by Cyrus H. K. Curtis consisted primarily of a publishing company business. One of the amazing facts of American history is the turn which has occurred in the fortunes of this company. The fact that the Securities & Exchange Commission's rules and regulations made virtually impossible the sale of the stock by the trustees is a significant factor in evaluating the administration of this trust.

For these reasons we hold that the trustees exercised common prudence and common skill, that they are not guilty of willful default or malfeasance or supine negligence, that they are not personally responsible for any loss in the administration of the trust, and that

there is no liability on the part of any of the trustees living or dead. . . .

At the audit a request was made that this trust be terminated, because of its drastic diminution in size, in favor of the two residuary trusts set up under the will of Mary Curtis Zimbalist. One of these is for the benefit of the children and more remote descendents of W. Curtis Bok; the other is for the benefit of the descendants of Cary W. Bok. We are informed that the beneficiaries of these two trusts are also the ultimate beneficiaries of the Penobscot Trust and that there would be no possibility of a grandchild or great grand-child, who might ultimately be determined to be the takers should the Penobscot Trust continue in force, being cut out by premature termination of that trust at this time.

All beneficiaries of the Penobscot Trust having approved the termination of the trust in the manner suggested, Mr. White stated that the terms of the proposed termination would have an insignificant impact on the interests of the persons he represents as guardian and trustee ad litem. The trustees of the two receiving trusts have also approved this arrangement. Under these circumstances the auditing judge will approve termination as requested. See cases cited in Hunter's Commonplace Book, Trusts, §12(a). . . .

And now, May 11, 1973, the account is confirmed nisi.