J-A24038-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: THE CHRISTINE D'ANDREA IRREVOCABLE TRUST | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: MARK D'ANDREA | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 579 EDA 2020 |

Appeal from the Order Entered January 10, 2020
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s):  No. 2017-X3620

| | | |
|---|---|---|
| IN RE: THE CHRISTINE D'ANDREA IRREVOCABLE TRUST | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: CHRISTINE D'ANDREA | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 580 EDA 2020 |

Appeal from the Order Entered January 10, 2020
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s):  No. 2017-X3620

| | | |
|---|---|---|
| IN RE: THE CHRISTINE D'ANDREA IRREVOCABLE TRUST | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: CHRISTINE D'ANDREA | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 581 EDA 2020 |

Appeal from the Order Entered January 10, 2020
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s):  No. 2017-X3620

J-A24038-21

BEFORE:   LAZARUS, J., DUBOW, J., and PELLEGRINI, J.[*]

MEMORANDUM BY LAZARUS, J.:                    **FILED MARCH 21, 2023**

These are cross-appeals from the adjudication,[1] entered[2] in the Court of

Common Pleas of Montgomery County, confirming the account filed by Mark

D'Andrea ("Mark"), Co-Trustee of the Trust Under Deed of Velma D'Andrea,

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] At the outset, we note that our review of this matter has been significantly impeded by the failure of the Orphans' Court to make proper findings of fact and determinations of credibility in relation to many of the objections raised by Christine.  Many of the court's rulings on specific objections were stated in a conclusory manner, without reference to controlling law or facts of record. As a result, this Court was compelled to comb the record in an effort to ascertain the propriety of those rulings.  Accordingly, we remind the Orphans' Court of its obligation to provide an opinion detailing the reasons for its rulings and where in the record those reasons may be found.  ***See*** Pa.R.A.P. 1925(a).

[2] For reasons which are lost to time, the Orphans' Court issued two identical adjudications in this matter.  The first was signed by the court on December 30, 2019, mailed to the parties on January 6, 2020, and docketed/sent on January 10, 2020.  The second adjudication was signed by the Orphans' Court on January 7, 2020, mailed to the parties on January 8, 2020, and docketed/sent on February 3, 2020.  To confuse matters even further, on January 31, 2020, the court signed an "Amended Order," which was docketed and sent on February 3, 2020, stating that "the Adjudication dated January 7, 2020, is appealable thirty (30) days from the date of this order."  Order, 1/31/20.  As a result of the Orphans' Court's perplexing actions, Christine filed two notices of appeal, one referencing each adjudication.  Mark filed his notice of appeal on January 29, 2020, referencing the date of the first adjudication entered by the court.  Because the second adjudication is identical to the first, we will consider the first adjudication to be the operative one for purposes of determining the timeliness of the parties' notices of appeal, both of which were timely filed within thirty days of January 10, 2020, the date that adjudication was docketed and sent to the parties.  ***See*** Pa.R.A.P. 108(b) ("The date of entry of an order in a matter subject to the Pennsylvania Rules of Civil Procedure shall be the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.Civ.P. 236(b).").  We have amended the captions to reflect the date on which the first adjudication was entered.

- 2 -

Settlor, f/b/o Christine D'Andrea ("Christine"). Upon careful review, we affirm in part, reverse in part, and remand for additional proceedings consistent with the dictates of this memorandum.

Settlor was the D'Andrea family matriarch who controlled the family's successful cement business. In 1999, Settlor created fourteen separate irrevocable trusts for the benefit of various family members, including trusts for her son, Mark, and his wife, Christine. At issue in this matter is the trust created for the benefit of Christine ("Trust"). Under the terms of the Trust, Mark and Christine were named as co-trustees,[3] with net income payable at least quarterly to Christine. As co-trustee, Mark was also given discretion to "pay to or apply for the benefit of [Christine] so much of the principal (up to the entire amount thereof) as the co-Trustee . . . deems advisable from time to time, for her comfort, health, education, maintenance[,] and support." Christine D'Andrea Irrevocable Trust, at ¶ SECOND(a)(2). Mark was also named as business trustee and given broad powers to invest Trust funds in any closely-held businesses as he should deem fit. *See id.* at ¶ SIXTH. Settlor waived any conflicts of interest arising from Mark's investment of Trust funds in a business in which he also serves as an officer, director, or employee. *See id.* at ¶ SIXTH(f). Settlor further released Mark, as business trustee, from any liability "for depreciation in value or loss by reason of the retention of any

---

[3] As beneficiary of the Trust, Christine was barred from participating in any decision regarding the distribution of income or principal. *See* Christine D'Andrea Irrevocable Trust, at ¶ SEVENTH(b).

such business interest[,] except for depreciation or loss resulting from fraudulent acts" of the business trustee. *Id.* at ¶ SIXTH(g). Upon Christine's death, income is distributable to Mark, if he survives, along with such discretionary distributions of principal as the trustee may deem appropriate for his health, education, maintenance, and support. *See* ¶ SECOND(b)(B). Upon the death of the survivor of Christine and Mark, the remaining principal is to be held in further separate trusts for Mark's living descendants until each such descendant attains the age of 35. *See id.*

The family cement business was liquidated in 2010 and the proceeds were distributed to the Trust, Mark's trust, and Mark individually. The Trust received $503,715.60 in securities and a 29.985% interest in property located at 14051 Townsend Road in Philadelphia ("Townsend Road Property").[4] Settlor died on December 24, 2011. On January 1, 2013, Mark formed Mark D'Andrea, LLC ("LLC") to maintain and manage the Townsend Road Property. The LLC was owned as follows: (1) Mark, individually, 40.612%; (2) the Trust, 29.985%; and (3) Mark's trust, 29.403%. Contributions totaling $423,000 were made by the members, in proportion to their ownership interests. Mark began to market the Townsend Road Property for sale in 2012. After Mark rejected several offers he deemed too low, the property was ultimately sold in July 2017 for $1,750,000, nearly $700,000 over its appraised value. *See*

---

[4] The Townsend Road Property was purchased in the early 2000s by the family business, which was operated out of a building at that location. Mark also operated his separate business, Mark D'Andrea, Inc., out of the Townsend Road Property.

N.T. Trial, 4/9/19, at 93, 96 (Mark's accountant testifying as to sale and appraised values). Following the closing of the sale, on September 18, 2017, Mark repaid the Trust its $126,836.55 principal investment in the LLC. The remainder of the sale proceeds were deposited into an interest-bearing money market account pending final distribution. On May 9, 2018, Mark issued a final distribution of the Trust's proportional share of the settlement proceeds in the amount of $315,023.90.

Exponentially complicating this matter is the fact that Mark and Christine were separated in 2016 and acrimonious divorce proceedings are still ongoing. Christine spent the majority of the couple's marriage as a stay-at-home mother, while Mark ran his lucrative business until his retirement in 2012. As sole breadwinner, Mark paid the vast majority (if not all) of the family's expenses. At trial, Mark expressed frustration with Christine's spending and housekeeping habits, and even accused her of killing his dog. Christine accused Mark of being abusive and controlling. This unfortunate situation forms the backdrop of this case, which was initiated by Christine with the filing, on October 2, 2017, of a "Petition for Citation to Show Cause Why Mark D'Andrea Should Not Be Removed as Co-Trustee and a Successor Co-Trustee Appointed, Why Mark D'Andrea Should Not Immediately Deposit Proceeds from the Sale of a Trust Asset to the Trust, and Why Mark D'Andrea Should Not Be Surcharged." On November 21, 2017, the court ordered Mark to file an account of his trusteeship, which he did on January 3, 2018. Christine filed objections, raising numerous claims regarding, *inter alia*, Mark's alleged

improper use of Trust funds. Following discovery, a hearing was conducted on April 8 and 9, 2019. At the April 8, 2019 hearing, Mark advised the court of his resignation as co-trustee. Both parties filed post-trial briefs.

On September 9, 2019, Mark filed a petition for adjudication, to which Christine raised numerous additional objections. Among other things, Christine objected to Mark's request for counsel fees and requested that the court order Mark to pay her counsel fees. The parties submitted briefs addressing the issues raised in Christine's objections to the petition for adjudication. On January 10, 2020, the Orphans' Court entered its adjudication, in which it sustained, in part, and denied, in part, Christine's objections to the account. Both parties filed motions for reconsideration. Before the court could act on those motions,[5] the parties filed cross-appeals, followed by court-ordered Pa.R.A.P. 1925(b) concise statements of errors complained of on appeal.

Mark raises the following issues for our review:

1. Did the Orphans' Court err when it only surcharged Mark despite [finding] that Christine breached her fiduciary duties as co-trustee and is responsible for any loss that results from her

---

[5] A trial court no longer has the power to act on a motion for reconsideration when it fails to issue an order expressly granting the motion within the time prescribed for seeking appellate review. *See Manufacturers and Traders Trust Co. v. Greenville Gastroenterology, SC*, 108 A.3d 913, 918 (Pa. Super. 2015) ("If a court fails to act on a timely reconsideration motion within the appeal period, it loses jurisdiction to do so."). Here, the Orphans' Court did not act on the motions for reconsideration within the thirty-day appeal period. Accordingly, the court's inaction had the effect of a denial pursuant to Pa.R.A.P. 1701.

negligence as co-trustee and by summarily dismissing Mark's equitable claims in a footnote?

2. Did the Orphans' Court err when it surcharged Mark for 50% of certain household expenses contrary to the terms of the Trust, the RESTATEMENT (THIRD) OF TRUSTS, testimony of counsel for the Trust, and undisputed facts that Mark personally paid the majority of household expenses?

3. Did the Orphans' Court err when it held that $126,000 from the Trust was the only liquidity for sustaining the operations of Mark D'Andrea, LLC[,] and surcharged Mark as a result when the Trust only owned 29.985% of the LLC?

4. Did the Orphans' Court err in surcharging Mark for alleged mathematical and accounting errors[,] and in particular[,] for failing to identify a "loan" to the LLC in the accounting[,] when Christine presented no evidence on this issue at trial and when the accounting reflects that such "loan" was repaid to the Trust [as a "capital contribution"]?

5. Did the Orphans' Court err in surcharging Mark in the amount of $14,175 for the alleged loss of interest on the sale of the Townsend Road Property when the Trust already received interest as part of the distribution from the LLC, the timing of the payment was due to actions of professionals to complete the sale, there was no objection to the timing[,] and had the sale been completed sooner, the proceeds would have been placed in the Trust's investment account with interest well below 6%?

6. [D]id the Orphans' Court err in finding that Mark engaged in self-dealing?

7. Did the Orphans' Court err in denying Mark's request for attorneys' fees?

Brief of Appellant, at 10-11 (unnecessary capitalization omitted).

Christine raises the following claims on cross-appeal:

1. Did the [Orphans' Court] err in failing to surcharge [Mark] for household expenses [he] paid directly from the [T]rust, where substantial evidence demonstrated that these household expense

payments were improper and indistinguishable from other household expense payments for which [Mark] was surcharged?

2. Did the [Orphans' Court] err in failing to surcharge [Mark] for paying credit card bills with [T]rust funds, where the credit card bills related to household expenses that were indistinguishable from other household expense payments for which [Mark] was surcharged, and the [Orphans' Court] improperly based its ruling on the beneficiary/co-trustee being aware of the payments?

3. Where [Mark] solely controlled a management company that he co-owned with the [T]rust, paid his own personal expenses with that company's funds, then reimbursed the company from the [T]rust, was the [Orphans' Court] erroneously unclear as to whether it surcharged [Mark] for those specific personal expense payments or[,] in the alternative, did it err in failing to surcharge [Mark] for the lost interest to the [T]rust from those payments?

4. Where the trustee that co-owns real property with the [T]rust collects a large management fee for himself from the sale proceeds of that property, and the [Orphans' Court] found that the purported basis for the fee was incredulous, did the [Orphans' Court] err by failing to surcharge [Mark] for the [T]rust's share of the management fee?

5. Where the [Orphans' Court] found that [Mark] breached his fiduciary duty to the [T]rust, caused financial harm to the [T]rust[,] and surcharged the [T]rustee, did the [Orphans' Court] err in failing to rule that [Christine] was entitled to attorneys' fees?

Brief of Cross-Appellant, at 5-6.

We begin by noting our standard and scope of review:

When reviewing a decree entered by the Orphans' Court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses and, on review, we will not reverse its credibility determinations absent an abuse of that discretion. However, we are not constrained to give the same deference to any resulting legal conclusions. The Orphans' Court['s] decision will not be reversed unless there has been an abuse of discretion or a fundamental error in applying the correct principles of law.

> This Court's standard of review of questions of law is *de novo*, and the scope of review is plenary, as we may review the entire record in making our determination. When we review questions of law, our standard of review is limited to determining whether the trial court committed an error of law.

*In re Fiedler*, 132 A.3d 1010, 1018 (Pa. Super. 2016) (citations and quotation marks omitted).

We begin by addressing Mark's claims. However, where appropriate, we will address certain of the parties' claims together for ease of disposition. Mark first asserts that the Orphans' Court erred by only surcharging him, despite finding that Christine breached her fiduciary duties as co-trustee and by dismissing Mark's equitable claim of laches on the basis of unclean hands. Specifically, Mark asserts that the court erred in summarily concluding that, because Mark's conduct as Trustee was "less than respectable," he was barred by the doctrine of unclean hands from asserting the defense of laches. He also asserts that, because Christine was a co-trustee who failed to uphold her fiduciary obligation to use reasonable care to prevent her co-trustee from committing a breach of trust, the court erred by only imposing a surcharge on him. He is entitled to no relief.

We begin by addressing Mark's laches claim. The question of whether laches applies is a question of law; thus, we are not bound by the trial court's decision on the issue. *Fulton v. Fulton*, 106 A.3d 127, 131 (Pa. Super. 2014) (citations omitted).

> Laches, similar to a statute of limitations, may bar a party from seeking equitable relief after the lapse of a certain period, usually six years. Laches bars relief when the complaining party is guilty

of want of due diligence in failing to promptly institute the action to the prejudice of another.

Laches is not excused by simply saying: "I did not know." If by diligence a fact can be ascertained[,] the want of knowledge so caused is no excuse for a stale claim. The test is not what the plaintiff knows, but what he might have known, by the use of the means of information within his reach, with the vigilance the law requires of him.

*In re Estate of Warden*, 2 A.3d 565, 579 (Pa. Super. 2010) (internal citations and quotation marks omitted).

In order to prevail on an assertion of laches, a trustee must establish: (1) a delay arising from the beneficiary's failure to exercise due diligence; and (2) prejudice to the trustee resulting from the delay. *Sprague v. Casey*, 550 A.2d 184, 187 (Pa. 1988). "[T]he sort of prejudice required to raise the defense of laches is some changed condition of the parties [that] occurs during the period of, and in reliance on, the delay." *Id.* at 188. The question of laches is factual and is determined by examining the circumstances of each case. *Id.* at 188.

Here, Mark has failed to argue, much less establish, that he suffered any prejudice as a result of any delay on Christine's part. *See id.* Accordingly, we cannot say that the Orphans' Court erred in declining to apply the doctrine of laches in this matter.[6]

_____

[6] Although the Orphans' Court declined to apply laches based on the doctrine of unclean hands, "it is a well-settled doctrine in this Commonwealth that a trial court can be affirmed on any valid basis appearing of record." *In re T.P.*, 78 A.3d 1166, 1170 (Pa. Super. 2013).

Mark also asserts that the Orphans' Court should have also imposed a surcharge on Christine because she, too, breached her fiduciary duties as co-trustee. However, Mark failed to raise this claim before the Orphans' Court. "Issues not raised in the trial court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). Accordingly, Mark has waived this claim for purposes of appellate review.

Mark next claims that the Orphans' Court erred by surcharging him for 50% of certain household expenses paid from the Trust, which he claims was contrary to the terms of the Trust, the Restatement (THIRD) of Trusts, the testimony of William C. Hussey, II, Esquire, counsel for the Trust, and the fact that Mark, personally, paid the majority of household expenses. Specifically, the court surcharged Mark for 50% of the following expenses that were paid from Trust funds:

- $450.00 for child psychiatric evaluation;

- $12,137.61 for school property taxes for marital home;

- $12,680.00 for joint property at Commodore Bay Club (shore home);

- $400.00 to Progressive Insurance for snowmobile insurance;

- $993.00 for children's dental care;

- $691.63 for clothes dryer for marital home; and

- 6% statutory interest for loss of interest on trust funds used for children's tuition and later reimbursed.

*See* Adjudication, 1/7/20, at 12.

Mark asserts that these distributions were permissible under the discretionary powers granted to him under Paragraph SECOND(a)(2) of the Trust, which provides that the trustee may "pay to or apply for the benefit of [Christine] so much of the principal (up to the entire amount thereof) as [the trustee] deems advisable from time to time, for her comfort, health, education, maintenance and support[.]"  **See** Brief of Appellant, at 36; Christine D'Andrea Irrevocable Trust, 6/30/99, at ¶ SECOND(a)(2).  He claims that "[t]he word 'support' is generally used to mean articles for the sustenance of the family, as food, etc."  **Id.**, quoting **Winthrop Co. v. Clinton**, 46 A. 435, 437 (Pa. 1900).  Mark argues that "[t]rust terms for 'support' have also been 'interpreted to mean that the trustee is to be guided by the beneficiary's accustomed standard of living, or "station in life," and usually also includes support for the beneficiary's household.'"  Brief of Appellant, quoting BOGERT'S THE LAW OF TRUSTS AND TRUSTEES § 228.  Mark asserts that, as a family member, he was permitted to tangentially benefit from the expenditures and it would be "hard to conceive of a distribution to a parent or a married person . . . that does not have an ancillary benefit for that person's immediate family members."  Brief of Appellant, at 37, quoting N.T. Trial, 4/9/19, at 178 (testimony of Attorney Hussey).  Mark also argues that, because he paid the vast majority of the household's large expenses, including the mortgage, vacation home, taxes, insurance, and vehicle expenses, it was proper to use Christine's trust to discharge a portion of her obligation of support.  **Id.** at 39.  Finally, Mark asserts that his reliance on the advice of counsel regarding the

propriety of payments from the trust relieves him of liability pursuant to the terms of Paragraph FIFTH of the Trust, which provides that the "Trustee is expressly relieved of any liability or responsibility whatsoever for any act or failure to act, or for following the advice of . . . attorneys . . ., so long as the Trustee exercises due care in their selection." *Id.* at 40-42, quoting Christine D'Andrea Irrevocable Trust, 6/30/99, at ¶ FIFTH(p).

In response, Christine argues that "[t]here is no provision in the Trust that allows Trustee to make distributions to benefit himself or relieve his own support obligations" and that Paragraph SECOND(a)(2) "is clearly designed to benefit [Christine], for ***her*** comfort, health, education, maintenance, and support." Brief of Appellee, at 27 (emphasis in original). She asserts that "a careful reading of ***Winthrop Co.*** finds support for a more narrow definition of support, applying the definition to costs related to 'necessities,' something costs such as the Commodore Bay Club condominium fees and snowmobile insurance premiums do not meet." *Id.* Regarding Mark's argument that the payments discharged Christine's duty of support, Christine argues that "courts do not get involved in support determinations where the parties are living under the same roof" and that "married persons are liable for [the] support of each other according to their respective abilities to provide support[.]" *Id.* at 29. Thus, "[g]iven that [Mark] voluntarily retired from his wildly successful business[,] which generat[ed] over $1,000,000 annually versus [Christine,] who was primarily a [housewife] raising the parties' children, if there were support obligations[,] they would be substantially larger on [Mark's part]."

*Id.* Christine also challenges Mark's claim that he paid "virtually all" of the household expenses, asserting that the testimony supporting the claim is "vague" and "self-serving" and "in no way establishes relative support obligations to entitle [Mark] to unilaterally justify the amount of money he distributed from the Trust for household expenses to benefit himself." *Id.* at 32. Finally, Christine argues that Mark's "advice of counsel" defense fails, because Mark "selectively or falsely presented information to his attorney to get the advice he wanted" and legal advice "is only as accurate and reliable as the underlying information [the attorney] receives from the client." *Id.* at 33.

In general, "[a] trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary." *In re Paxson Trust I*, 893 A.2d 99, 121 (Pa. Super. 2006).

> It is abundantly clear that trustees may not profit from trust property. Cases old and new, decided by every level of court in this Commonwealth, support this basic rule. "[T]here is no principle better settled than that a trustee is not permitted to obtain any profit or advantage to himself in managing the concerns of the *cestui que* trust." *Raybold*[ *v. Raybold*], 20 Pa. [308,] 312 [(1853)]. "It is a well[-]recognized general rule that a trustee or fiduciary may not use trust property for his own benefit and if he does[,] he is liable to a *cestui que* trust for profits made by him from the use of trust property." *Stahl, Attorney General v. First Pennsylvania Banking and Trust Company*, [] 191 A.2d 386, 388 ([Pa.] 1963).

*Id.* at 122.

The terms "support" and "maintenance" are "[p]robably the most common guides used in grants of discretion" and are "sometimes accompanied

by a reference to the beneficiary's accustomed standard of living or station in life." Restatement (Third) of Trusts, § 50, cmt. (d)(2). "The accustomed manner of living for these purposes is ordinarily that enjoyed by the beneficiary at the time of the settlor's death or at the time when an irrevocable trust is created." *Id.*

> Language of "comfort" often accompanies a support standard. Whether modifying support (e.g., "comfortable support" or "support in reasonable comfort") or as an additional standard ("support and comfort"), the normal construction is the same: the language adds nothing to the usual meaning of accustomed support (supra) for a beneficiary whose lifestyle is already at least reasonably comfortable.

*Id.* at cmt. (d)(3).

A support standard normally covers not only the beneficiary's own support but also that of persons for whom provision is customarily made as a part of the beneficiary's accustomed manner of living. *Id.* at cmt. (d)(2). This generally includes the support of members of the beneficiary's household and the costs of suitable education for the beneficiary's children. *Id.*

Here, the record reflects payments from the Trust for everyday family and household expenses, of the type generally borne by married persons, which Mark, in his capacity as trustee, chose to pay—in full—from Christine's trust. The Orphans' Court was presented with a unique situation in which one spouse is serving as the trustee of the other spouse's trust and making discretionary distributions that not only discharge the beneficiary spouse's obligation of support, but also relieves the trustee spouse of his own

obligation. To the extent that Mark historically paid the vast majority of the family expenses from his own income, this was the result of a joint decision of the parties, that Mark would work outside the home to support the family financially, while Christine would work as a homemaker and raise the couple's children. Mark's desire to be relieved of some of these financial obligations does not justify his use of Trust assets to do so. The Orphans' Court made credibility determinations and concluded that Mark simply took advantage of his access to Trust funds to offset his own obligation of support to the family unit and did so in violation of his fiduciary duty.[7] ***In re Paxson Trust I***, ***supra*** (trustees may not profit from trust property). We can discern no abuse of discretion.

The court also acted within its discretion to reject Mark's claim that he relied on the advice of counsel in utilizing Trust funds to pay for these specific expenses is not supported by the record. As the Orphans' Court noted, "[n]o clear and convincing evidence was presented [that Mark] consulted a professional prior to [engaging in] the . . . transactions." Adjudication, 1/7/20, at 11 (emphasis in original).

In a related claim, Christine asserts that the Orphans' Court erred in failing to surcharge Mark for other household expenses for which he reimbursed himself from the Trust, where substantial evidence demonstrated that these payments were improper and indistinguishable from the above

---

[7] We note that the Orphans' Court only surcharged Mark for one-half of the expenditures in question.

payments for which Mark was surcharged. Specifically, Christine challenged the following payments: (1) payments dated 1/18/11, 3/1/11, and 5/16/11 totaling $18,294.51, identified in the account as "distribution[s] FBO Christine D'Andrea" and testified to by Mark as payments made directly to himself in reimbursement of household expenses such as housecleaning, groceries, and the family dog; (2) a payment to the Avalon Yacht Club dated 2/28/12 in the amount of $1,350 for family membership dues and a required food minimum; and (3) additional payments dated 4/8/11, 4/10/12, 7/3/12, 7/10/12, and 8/16/12, made directly to Mark from the trust, totaling $14,078.29, in reimbursement for "household expenses."

Mark counters that, unlike the expenses discussed above for which the Orphans' Court surcharged him, the household expenses referenced in this claim were "beyond normal household expenses and/or were for Christine's sole benefit." Brief of Cross-Appellee, at 29. Mark asserts:

> These [payments] were for reimbursement for payments he personally made for Christine's personal credit cards at Kohl's, American Express, Bloomingdale[']s and Macy[']s. No testimony was presented regarding the March 1, 2011 payment in the amount of $2,405.19. With respect to the $5,000 payment, Mark testified that this was for the non-essential household expenses of a housekeeper Christine hired and grooming bills for a puppy Christine bought.

*Id.* at 28. With regard to the 2015 Avalon Yacht Club payment, Mark argues that he derived no benefit from the family's membership in the club that year. Mark testified that he "told Christine he wanted to resign their membership .

- 17 -

. . but ultimately they did not resign because Christine wanted to keep it." **Id.** at 29.

"When seeking to impose a surcharge against [a trustee] for the mismanagement of an estate, those who seek the surcharge bear the burden of proving the [trustee's] wrongdoing." **Estate of Geniviva**, 675 A.2d 306, 311 (Pa. Super. 1996). Nevertheless, "where a significant discrepancy appears on the face of the record, the burden shifts to the [trustee] to present exculpatory evidence and thereby avoid the surcharge." **Id. See In re Ellis' Estate**, 333 A.2d 728 (Pa. 1975) (where account reflected dual payment of realty commissions for same property, burden of going forward with evidence establishing prudence, skill, and due care shifted to accountant); **In re Lohm's Estate**, 269 A.2d 451 (Pa. 1970) (where large overpayment in taxes is shown, burden shifts to fiduciary to present exculpatory evidence to avoid surcharge).

Here, the Orphans' Court overruled these objections "due to insufficient evidence presented at trial." **See** Adjudication, at 12 (overruling objections to household expenses). In doing so, the court improperly placed the burden on Christine to prove the impropriety of the distributions. On the face of the account, the descriptions of the distributions—i.e., "Distribution FBO Christine D'Andrea," "Check Number 1004," and "Household Expenses"— are vague and, particularly in the case of those distributions labelled "household expenses," suggestive of a breach of fiduciary duty, where Mark had an obligation of support to the family unit and that obligation was satisfied

by the Trust to which he owed a fiduciary duty. *See* discussion, *supra*. Moreover, where Mark paid the bills and maintained control of the Trust's check register, any documentary proof supporting these distributions would be in Mark's possession and most readily available to him, not Christine. Accordingly, the burden fell to Mark to present evidence of the propriety of these distributions. He failed to do so.

At trial, Mark presented no evidence other than his own, often vague,[8] testimony in support of payments he made from the Trust to himself in

---

[8] For example, the following exchange occurred between Mark and Christine's counsel:

Q: Now, let's go down further. We are going to the 5/12/11 entry, check 1007, all right?

A: All right.

Q: That's $5,000. It's a deposit to Sovereign, right?

A: Yes.

Q: So that was a check to you, not to a credit card or reimbursing you for a credit card payment, right?

A: Um-hum.

Q: And that's not itemized anywhere, correct?

A: That is not itemized anywhere, I do not believe, at least not in the stuff you gave me.

Q: But you are aware that they were household expenses, right, such as housecleaning?

*(Footnote Continued Next Page)*

reimbursement of household expenses. He provided no receipts, credit card bills, or other documentary support for his claim that the expenses were for Christine's sole benefit. In short, Mark failed to demonstrate that the payments for "household expenses" were properly paid from the Trust. ***Estate of Geniviva***, ***supra***. Accordingly, we direct the court to impose an additional surcharge in the amount of $16,186.40, or 50% of the total payments, for "household expenses."

---

> A: They were—**I don't know what they were, because I don't know what they were**. I would have to really go back and research that and see if I still have those bills. **I don't know what they are**.
>
> . . .
>
> Q: If we go further there is another check entry at 1041 on April 10, 2012?
>
> A: Yes.
>
> Q: That's also $5,000 to Mark D'Andrea?
> A: Correct.
>
> Q: For household expenses, right?
>
> A: Yes.
>
> Q: And household expenses means things like a cleaner, is that right?
>
> A: They could mean a lot of things. **Household expenses, I am not sure specifically what they are**. I could probably get you an answer[,] if you want one[,] of what they are exactly. I didn't make the number up. I didn't just flip a coin and say $5,000. It was done for a reason like I did everything accounting-wise for a reason.

N.T. Trial, 4/8/19, at 201-03 (emphasis added).

Our review of the Avalon Yacht Club payment is hampered by the Orphans' Court's application of the incorrect evidentiary standard, as well as its failure to make any credibility determinations. Christine testified that Mark used the yacht club membership during the summer of 2015; Mark testified that he wanted to relinquish the membership and only visited Avalon once that season. Accordingly, we are constrained to remand this issue to the Orphans' Court for reevaluation in light of the proper evidentiary standard.

Next, Mark asserts that the Orphans' Court erred in ruling on Christine's objection number 12.[9] In ruling on that objection, the court stated as follows:

> Among the [LLC's] three initial investing entities, evidence presented at trial showed that only the $126,000 trust fund investment provided liquidity for sustaining company operations. [Mark's] admission that he used Management Company funds for debts outside of company operations, some of which he repaid, is sufficient to SUSTAIN Objection #12, and [Mark] is subject to surcharge as stated in objection 2 herein[,[10]] as these expenses appear to be the same.

_____

[9] Objection No. 12 stated:

> Objection is made to [Mark's] deviation from the Trust terms governing investments of principal in any closely-held business, which specifically provide that "only assets actually invested in any such business shall be liable for the debts incurred in its operation," by paying additional expenses not related to the management of Townsend Rd. out of the LLC, including but not limited to [Mark's] household bills and All Seasons Marina expenses for [Mark's] personal boat.

Objections to First Intermediate Accounting, 2/2/18, at ¶ 12.

[10] The surcharges related to Christine's objection number 2 were addressed above in Mark's first claim on appeal.

- 21 -

Adjudication, at 14.

> Mark argues that
>
> to the extent that [his] conduct as manager of the LLC is being challenged, such conduct is not properly addressed via this lawsuit, and would instead need to be challenged under the Pennsylvania Revised Uniform Limited Partnership Act, 15 Pa.C.S.A. § 8611 et seq., or the Pennsylvania Uniform Limited Liability Company Act of 2016, 15 Pa.C.S.A. § 8811 et seq. ***See Retina Assocs. of Greater Phil. v. Retinovi[t]reous Assocs.***, 176 A.3d 263, 277 (Pa. Super. 2017). Challenges to the action[s] of a[n] LLC manager or member may only be brought pursuant to 15 Pa.C.S.A. § 8881 (involving direct actions by LLC member) or 15 Pa.C.S.A. § 8882 (involving derivative actions). Christine failed to raise any such claims before the Orphans' Court.

Brief of Appellant, at 42-43.

Mark further asserts that, even if his conduct as manager of the LLC could be challenged in this litigation, "[t]he Trust terms give the Business Trustee the power to operate that closely[-]held business as he see[s] fit[] and without regard to any conflicts that would normally exist between his roles as Trustee and in the business." ***Id.*** at 43. Thus, in failing to distinguish between his actions as manager of the LLC and trustee of the Trust, the court improperly surcharged Mark for actions taken in his capacity as manager of the LLC.

In addition, Mark alleges that the court's finding that "only the $126,000 trust fund investment provided liquidity for sustaining company operations," Adjudication, 1/7/20, at 12, is directly contrary to the evidence of record and "completely disregards the fact that the Trust owned only a 29.985% interest

in the LLC, a fact which it explicitly recognizes earlier in the Adjudication." Brief of Appellant, at 44. Mark argues that

> the evidence established that Mark created a checking account for the LLC, which each member contributed to in proportion to their ownership interest, and that any expenses for sustaining the company operations were paid from that account (i.e. in proportion to the ownership interest of the LLC). This fact is further supported by the Operating Agreement—as executed by Christine—and general ledgers of the LLC, which reflect capital contributions from both Mark personally and from Mark's [t]rust in addition to the contributions made by [Christine's] Trust.

*Id.* at 44.

Finally, Mark asserts that the court's reference to "Objection 2" is misplaced, as the expenses for which Mark was surcharged under that objection were paid from the Trust and not the LLC.

In a related claim on cross-appeal, Christine argues that the court's ruling on this objection is "unclear as to whether an additional, separate amount should be imposed for this surcharge, or if the [Orphans' Court] found that the surcharge amount awarded [with regard to] Objection No. 2 also covers" this objection. Brief of Cross-Appellant, at 39. She asserts that, to the extent the Orphans' Court intended to impose a separate surcharge amount related to Objection No. 12, it must specifically include that amount in the Adjudication. If no additional surcharge was intended, Christine asserts she is entitled to "interest income lost for the period that the funds relating to the [c]apital [c]ontributions [s]urcharge were improperly removed from the Trust[.]" *Id.* at 40.

Here, the parties are correct that the Orphans' Court adjudication is completely unclear as it relates to the disposition of Objection No. 12. However, we agree with Mark that, in ruling on this objection, the Orphans' Court both misconstrued the record and committed an error of law by purporting to surcharge Mark for his conduct as manager of the LLC.

First, the court's statement that the $126,00 capital contribution from the Trust provided the LLC's only liquidity is patently belied by the record. The LLC's ledgers, introduced at trial, clearly show capital contributions not only from Christine's Trust, but from Mark, individually, and from the Mark D'Andrea Trust, in amounts proportionate to their respective ownership interests. **See generally**, Respondent's Exhibits R2-R7 (Mark D'Andrea LLC Year-to-Date Ledgers). As discussed *infra*, the capital contributed to the LLC by Christine's Trust was repaid in full, with interest, following the sale of the Townsend Road Property.

Second, the Settlor permitted Mark, as Business Trustee, to invest Trust funds in any closely-held business as he saw fit, to "deal with any business interest as freely as [Settlor] could have done," and released him from any loss in value by reason of the retention of any such business interest, except for losses resulting from fraud. Christine D'Andrea Irrevocable Trust, ¶ SIXTH. Thus, Mark's investment of Trust property in the LLC was within his broad discretionary powers under the Trust. To the extent that Christine wishes to challenge Mark's actions in his capacity as manager of the LLC, we agree with Mark that her recourse must be had under the Pennsylvania Limited Liability

Company Act. Accordingly, any additional surcharge intended by the court with respect to Objection No. 12 must be vacated.[11]

Mark next asserts that the Orphans' Court erred in surcharging him for alleged mathematical and accounting errors, and in particular, for failing to identify a "loan" to the LLC in the accounting, where Christine presented no evidence on this issue at trial and the accounting reflects that such "loan" was repaid to the Trust as a "capital contribution." Specifically, the court surcharged Mark in the amount of $20,989.50, "[even though] this was not addressed at trial[,]" Adjudication, 1/7/20, at 15, for a loan purportedly made by the Trust to the LLC. Because the evidence demonstrates that the court mischaracterized as loans certain capital contributions from the Trust to the LLC, which contributions were ultimately repaid with interest, we conclude that the court erred in imposing this surcharge.

"One who seeks to surcharge a trustee for breach of trust must bear the burden of proving the particulars of the trustee's wrongful conduct." **Estate of Pew**, 655 A.2d 521, 543 (Pa. Super. 1994). Here, Christine alleged in objection number 16 that an entry in a "trial balance sheet" for the LLC[12] in the amount of $20,989.50, characterized as a "loan," was not included in the

_____

[11] As noted above, it does not appear that the court actually imposed a separate surcharge as to Objection No. 12. However, in the interest of thoroughness, we clarify that any such surcharge is, or would have been, inappropriate.

[12] The trial balance sheet was introduced at Mark's deposition as Exhibit MDA-38.

account, and was never repaid. Christine presented no evidence at trial regarding this claim. However, Mark testified at his deposition that he had initially miscoded contributions of capital from the Trust as "loans" in 2013.

Q: I know we talked earlier about capital contributions that were made by each person, there's a series of loans here.

A: Yes, back in '13 this is initially the first year the company was— at some point I may have been miscoding stuff and I think [accountant Victor Broyan] had me change these from loans to— you know? I thought he told me loans to put them in, I think it's been changed. But all the numbers add up, capital contribution[,] loan[,] I think [they] all [were] intended to be the same thing, member[']s capital. It was miscoded one time and he had me fix it. I think entries were made to do that.

Deposition of Mark D'Andrea, 7/30/18, at 103-04.

A comparison of the LLC's "trial balance sheet" for the year 2013 with the account entries showing the Trust's capital contributions for that same year confirm Mark's testimony. Both documents reflect total payments from the Trust to the LLC of $26,986.50. As the record reflects that the challenged 2013 Trust payments are fully accounted for in the account, **see** First Intermediate Account of Mark D'Andrea, 1/3/18, at 152-53, the court erred in imposing a surcharge in that amount.

Mark next alleges that the Orphans' Court erred in surcharging him in the amount of $14,175 for the alleged loss of interest on the sale of the Townsend Road property.[13] Specifically, Mark asserts that: (1) the Trust

_____

[13] The Townsend Road Property was initially constructed by the family business and was jointly owned by the business and Settlor. At some point,
*(Footnote Continued Next Page)*

already received interest as part of the distribution from the LLC; (2) the timing of the payment was due to actions of professionals in completing the sale; (3) there was no objection to the timing; and (4) had the sale been completed sooner, the proceeds would have been placed in the Trust's investment account with interest well below 6%. We agree that the court erred in imposing this surcharge.

To obtain a surcharge, a beneficiary has the burden of proving not only a breach of fiduciary duty, but also that "a related loss occurred." ***Estate of Lychos***, 470 A.2d 136, 142 (Pa. Super. 1983). The burden then shifts to the trustee to prove that the loss would have occurred in the absence of the breach of fiduciary duty. ***Id.***

At trial, Christine presented no evidence to support her claims that the ten-month delay in distributing the net proceeds of sale constituted a breach of fiduciary duty, or that the Trust suffered a loss as a result. In fact, the sole evidence presented regarding interest on the sale proceeds was a letter from Mark's accountant, Victor Broyan, to Mark's attorney, William Hussey, Esquire, providing the details of the sale and distribution of the proceeds. ***See*** Broyan Letter, 5/15/18 (Trial Exhibit R-22). The letter reflects that, between the date of the sale and the date final distribution was made, the sale proceeds earned interest in the amount of $7,692.94. Mr. Broyan testified that final

---

Mark purchased Settlor's interest in the property. The LLC was operated out of the property, and the Trust received a 29.985% ownership interest in the property, commensurate with its ownership share in the LLC.

distributions were made in proportion to each party's ownership interests, *see* N.T. Trial, 4/9/19, at 104, and the figures contained in Mr. Broyan's letter reflect that the Trust's final distribution included its proportionate share of interest earned. Accordingly, because Christine failed to sustain her burden of proof, *Estate of Lychos*, *supra*, the Orphans' Court erred in imposing a surcharge for lost interest on the Townsend Road sale proceeds.

Mark next claims that the Orphans' Court erred in finding that he engaged in self-dealing. Specifically, Mark claims that, in appointing him as the co-trustee and sole trustee with authority to make distributions to Christine, Settlor implicitly waived any conflict of interest. *See* Brief of Appellant, at 56. Mark also claims that, to the extent he was surcharged for any conflicts of interest with respect to the LLC, those conflicts were waived by the Settlor.

> In general, [a] trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary. The rule prohibits both self-dealing and conflicts of interest. Thus, the trustee must neither (1) deal with trust property for the benefit of himself or third parties, nor (2) place himself in a position inconsistent with the interests of the trust.

*In re Paxson Trust I*, 893 A.2d at 119, quoting *Estate of McCredy*, 470 A.2d 585, 597 (Pa. Super. 1983) (quotation marks and brackets omitted).

> [A] trustee is bound not to do anything which can place him in a position inconsistent with the interests of the trust, or which have a tendency to interfere with his duty in discharging it . . . [and] may not profit at the expense of the beneficiaries nor assert any adverse interest in the trust property.

***In re Union Real Estate Inv. Co. First Mortgage 6% Gold Bonds***, 1 A.2d 662, 666 (Pa. 1938) (citations omitted).

Nevertheless, the settlor can waive the application of the rule of undivided loyalty, either explicitly under the terms of the trust, or by implication, by knowingly placing her trustee in a position that might conflict with the interests of the trust or its beneficiaries and giving the trustee power to act in that dual capacity. ***Estate of McCredy***, 470 A.2d at 600.

Here, we agree with Mark that Settlor explicitly waived all conflicts relating to Mark's interests as an owner, officer, director, or employee of any business with which Mark chose to deal in his capacity as business trustee. ***See*** Christine D'Andrea Irrevocable Trust, 6/30/99, at ¶ SIXTH. However, the Settlor did not include any similar language in either Paragraph SECOND (dispositive provisions), or any other provision of the Trust. Moreover, there is no inherent conflict of interest within an intact marital unit, such that it would be reasonable to infer that Settlor implicitly waived any such conflicts by appointing Mark as co-trustee, and Mark cites no case law to support this proposition. Thus, having concluded, *supra*, that Mark breached his fiduciary duty by utilizing Trust funds to discharge his own duty of support, we find no merit to this claim.

We now turn to our review of the remainder of Christine's claims on cross-appeal.[14] Christine first asserts that the Orphans' Court erred in failing

---

[14] We address Mark's final claim, regarding attorneys' fees, together with Christine's related claim, *infra*.

to surcharge Mark for paying her American Express credit card bills with Trust funds, where the credit card was used for household expenses that were indistinguishable from other household expenses for which Mark was surcharged. Christine asserts that, in declining to surcharge Mark, the court improperly concluded that Christine was aware of those payments, as "the record establishes that [Christine] did not know of the use[,] or the extent of the use[,] of the Trust to pay the Amex bills." Brief of Cross-Appellant, at 31.

We are constrained to agree with the Orphans' Court's determination, as it was based on credibility determinations regarding Christine's knowledge as to whether the funds used to pay her credit card bills came out of the trust. *In re Fiedler*, *supra*. While Christine denied knowing the source of the funds, she also admitted to having personally paid at least one credit card bill using a check from the trust account, which clearly identified the payors as "Christine D'Andrea and Mark D'Andrea CO-TTEES." N.T. Trial, 4/8/19, at 52. Christine testified that she did not know what "CO-TTEES" meant and that, when she asked him, Mark did not provide a clear answer. *See id.* However, Mark testified that Christine was, in fact, aware of the payments:

Q: When [Christine] testified that she didn't know that her trust was paying her Amex bills, do you agree with that statement?

A: Not even close.

N.T. Trial, 4/9/19, at 82. The Orphans' Court credited Mark's testimony that Christine was aware of, and acquiesced to, these payments, and the court's

determination is supported by record testimony. Accordingly, Christine is entitled to no relief on this claim.

Next, Christine asserts that the Orphans' Court erred in failing to surcharge Mark for the Trust's share of the management fee he paid to himself as manager of the LLC. Christine asserts she raised this issue in Objection No. 13, which states as follows:

> Objection is made to [Mark's] failure to distribute the [Property] sale proceeds from July 18, 2017, in the gross amount of $524,825.00, causing the Trust assets to remain over-concentrated in the LLC, resulting in the loss of income and a loss of principal appreciation.

Objections to First Intermediate Account of Mark D'Andrea, 2/2/18, at ¶ 13.

Christine's objection makes no mention of the management fee, nor could it reasonably be read to encompass an objection thereto. Moreover, in ruling on this objection, the Orphans' Court made no mention of management fees. "Issues not raised in the trial court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). Because she failed to properly raise a claim regarding LLC management fees before the Orphans' Court, Christine has waived it on appeal.

Finally, both parties assert that the Orphans' Court erred in failing to award them attorneys' fees. Christine asserts that the court should have awarded her attorneys' fees—which she requested in the WHEREFORE clause of her objections—in light of the fact that the litigation was made necessary by Mark's misconduct as co-trustee. The Orphans' Court's adjudication was silent as to Christine's request for fees. However, Christine notes in her brief

that, while she "has not yet filed a petition for payment of her attorneys' fees, [she] will do so following [the] results of these cross-appeals." Brief of Cross-Appellant, at 44. Because the Orphans' Court failed to address this issue in its adjudication, we dismiss this claim, without prejudice to Christine's right to file an appropriate petition before the Orphans' Court.

Mark also asserts that the court erred in failing to award him attorneys' fees. Mark claims that, "'[a]s a general rule[,] the expenses of filing an account by a trustee are properly chargeable to the trust estate,' including attorney's fees." Brief of Appellant, at 58, quoting **In re Band's Estate**, 124 A.2d 498, 500 (Pa. Super. 1956). Mark argues that, because he successfully defended over half of the objections filed by Christine, he is entitled to a portion of the attorneys' fees related to the surcharge action. Mark notes that one of the primary bases for the Orphans' Court's denial of fees is contradicted by the court's own findings earlier in the Adjudication. **See** Brief of Appellant, at 61. Specifically, the court noted Mark's "subordinat[ion of] his fiduciary duty in favor of his personal desire for revenge against" Christine, as a result of which he "fail[ed] to make income distributions in accordance with trust terms." Adjudication, 1/7/20, at 16 (ruling on request for attorneys' fees). However, previously, the court specifically overruled Christine's objection to Mark's failure to make those same quarterly distributions because he had made other discretionary distributions for Christine's benefit in lieu thereof. **See id.** at 12 (ruling on objection relating to mandatory distributions).

"In passing upon the amount of counsel fee[s] we bear in mind the well settled principle that:  'Supervision of the amount of compensation is peculiarly within the discretion of the court below.  Unless such discretion is clearly abused the judgment will not be disturbed on appeal[.]'" ***In re Browarsky's Estate***, 263 A.2d 365, 366 (Pa. 1970), quoting ***Faust's Estate***, 73 A.2d 369, 370 (Pa. 1950).  "The general rule is that each party to adversary litigation is required to pay his or her own counsel fees. . . .  In the absence of a statute allowing counsel fees, recovery of such fees will be permitted only in exceptional circumstances[.]" ***Estate of Wanamaker***, 460 A.2d 824, 825 (Pa. Super. 1983).

"It is well[-]established that whenever there is an unsuccessful attempt by a beneficiary to surcharge a fiduciary[,] the latter is entitled to an allowance out of the estate to pay for counsel fees and necessary expenditures in defending himself against the attack." ***In re Browarsky's Estate***, 263 A.2d at 366, quoting ***Wormley Estate***, 59 A.2d 98, 100 (Pa. 1948).  However, where objections to an account result in surcharges with respect to some claims, but not others, a court acts within its discretion in choosing whether to award attorneys' fees. ***See In re Jones' Estate***, 23 A.2d 434 (Pa. 1942).

Here, we conclude that the Orphans' Court acted within its discretion in denying Mark's request for attorneys' fees related to the surcharge action.  In particular, the court found that Mark breached his fiduciary duty by using trust

assets for his own benefit, and we affirm that determination herein.[15]  Under such circumstances, the court did not abuse its discretion in declining to award fees stemming from the surcharge action.  **See id.**

However, we conclude that the court abused its discretion in failing to award Mark reasonable attorneys' fees and costs incurred in the preparation and filing of the account.  "It is the right, and generally the duty, of a trustee to secure legal advice and assistance in preparing and presenting an account to the Orphans' Court."  **In re Band's Estate**, 124 A.2d at 501.  "As a general rule the expenses of filing an account by a trustee are properly chargeable to the trust estate."  **Id.** at 500.  Accordingly, on remand, we direct the Orphans' Court to hold further proceedings to determine reasonable fees and costs payable to Mark in conjunction with the preparation and filing of the account.

Order affirmed in part and reversed in part.  Case remanded for further proceedings to determine:  (1) the propriety of the payment of Avalon Yacht Club fees from trust funds and (2) reasonable fees and costs incurred by Mark in the preparation and filing of the account.  Jurisdiction relinquished.

---

[15] We agree with Mark that the Orphans' Court contradicted itself by faulting Mark for failing to pay mandatory distributions, while declining to surcharge him for that reason.  However, the fact remains that he engaged in self-dealing.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/21/2023